[No. 603. Decided March 7, 1889.]

CORPORATION OF THE CATHOLIC BISHOP OF NESQUALLY v. JOHN GIBBON, T. M. ANDERSON, R. T. YEATMAN, AND THE UNITED STATES OF AMERICA.

### EJECTMENT—PUBLIC LAND GRANTS—ALIENS.

Where plaintiff is not, and defendant is, in possession of land claimed by the former, the proper form of remedy is ejectment.

Organic act Or., § 1, provided "that the title to the land, not exceeding 640 acres, now occupied as missionary stations among the Indian tribes of said territory, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations, respectively, belong." *Held*, That the grant was confined to land occupied as a mission station, and to not exceeding 640 acres, including improvements. If, in any case, there was no land so occupied, no land was granted; if less than 640 acres was so occupied, then only the less quantity was granted.

The purpose of the grant, as shown by the history of the time, was to encourage settlement in that territory by American settlers, and to reward them for overcoming British occupation, and not to grant land to British subjects, nor to foreigners, nor to those acting under the Hudson Bay Company.

*Appeal from District Court, Clarke County.*

Bill filed by the "Corporation of the Catholic Bishop of Nesqually" against John Gibbon, and others. Decree for defendant, and plaintiff appeals.

*Whalley, Bronaugh & Northup,* for appellant.

*W. H. White,* U. S. District Attorney, for appellee.

The opinion of the court was delivered by

LANGFORD, J.—The complainant in this case claims title under the first section of the organic act of the Territory of Oregon, which reads as follows: "That the title to the land, not exceeding six hundred and forty acres, now occupied as missionary stations among the Indian tribes of said territory, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations, respectively, belong." The wrongs complained of are, that the military officers of the United States, in May, 1849, took possession of all the 640 acres claimed by the plaintiff under said act except such as was inclosed by the Hudson Bay Company, and afterwards, in October, 1853, the United States reserved for a military reservation 430 acres of the 640 acres. It appears that of the 430 acres aforesaid it has all been in possession of the United States since May, 1849, except the small portion thereof occupied by the church buildings, and a tract of about five acres fenced by the plaintiff, and that shortly before this action was brought defendant entered upon and tore down fences, and cut down trees, upon these five acres, which is the additional wrong complained of. With the exception of said entry on the five acres there appear to

38—1 WASH.

have been no entry upon any of the land claimed since May, 1849. The action was brought and tried upon the equity side of the court, without any jury trial having been claimed or waived in writing, as the statute provides. The wrong complained of, then, and shown to exist, if it be a wrong, is: *First*, A claim upon the part of the defendant of title to all the land except the small portion upon which the church stands. *Second*, Trespass; threatened ouster from the five acres. As to wrong to the five acres, there was a complete remedy at law, in trespass, to try title, and perhaps an auxiliary remedy of injunction to stay trespass and waste during the pending of said action below. Hence, for this wrong, a bill will not lie. As to the claim of title to that portion exclusive of the five acres it does not appear that defendant was ever in actual possession, or was ever ousted any further than if plaintiff claims title. So does defendant, and defendant has been in the actual possession since 1849, and plaintiff not in possession. The wrong, if any, is that the United States has claimed title and been in possession of the land which is plaintiff's property. If this is true, the wrong is a legal wrong, and, as to the proper remedy, it is in the nature of ejectment under our statute. Perhaps the plaintiff, as to the five acres, may waive his case of trespass, and, under § — of our statute, which provides that one in possession of land may sue in equity any one claiming title thereto, and have the title declared by the court, bring this action. There are two wrongs complained of in this case as to the five acres: *First*, trespass; *second*, claim of title of land possessed by plaintiff. So, on the latter claim, we will proceed to examine the title and declare it. As to the other portion, we think that it is not before the court, for the defendant does not claim the land upon which the church buildings stand, nor has any trespass been committed or threatened thereto; and as to all the remainder, except the five acres, the plaintiff is not possessed, and hence has his action of eject-

ment only. As to the title, there is no act of congress except the one cited. No provision is made for any ministerial officer to survey or adjudicate it. When congress grants land not described in the act of grant, the same is void for want of description until the same is located by some person authorized by congress to locate it. If a grant is made of land within certain specified boundaries, and no provision is made as to the precise boundaries of the land granted, it may be that the act itself empowers the grantee, by implication, to select the particular tract. We take it that the grant of land, in this instance, is of the latter class. It is to not exceed 640 acres of land, including improvements, now occupied as mission stations. "Now occupied" is a description of the land, but if more than 640 acres of land was thus occupied, then not exceeding 640 acres of that thus occupied was granted. This would appear to imply that the grantee might abandon all previously occupied, except 640 acres, and select the remainder out of any of the occupied land. This power is, however, again limited to include mission improvements. Then the power to select in the grantee was confined to land occupied as a mission station, and not to exceed 640 acres; which must include the improvements. If, in any case, there was no land occupied as a mission station, then no land was granted, and hence no selection of 640 acres could be made. If less than 640 acres of land was so occupied, then 640 acres were not granted, but only the less quantity which was so occupied. The words are of present grant, and no ministerial officer was authorized to locate it, nor pass upon it. The question of title, then, is a judicial question, exclusively, and the court will determine whether the land claimed is of the description granted, and, the question being judicial, the decisions of ministerial officers are not in the least binding, whether as to fact or law. The opinions of ministerial officers on such a question ought to have no more effect than the opinion of a private lawyer equally

well learned would have in a like case. Except by the way of argument, all these decisions must be disregarded by the court. Is, then, the land claimed that described in the act of grant, to wit, land occupied as a mission station, August 14, 1848, or prior thereto?

What is the meaning of the words " occupied as a mission station among the Indian tribes?" The word " occupied " is synonymous with "possessed." Possession of particular land cannot exist except by a claim to dominion thereover, as evidenced by acts. Now, on August 14, 1848, and previous to that time, the missionaries did not claim dominion over any of this land, as evidenced by their words or acts; but the Hudson Bay Company claimed and exercised exclusive dominion over it. To occupy as a mission station is to exercise dominion and control of it, by the missionaries, for missionary purposes. The mere going upon the property possessed by another, by his permission, and there exercising religious rites, is not to occupy as a mission station. The Hudson Bay Company occupied this land exclusively until long after August 14, 1848, and the missionaries, as well as this land, were under that company's dominion and control. As the brief well says, the missionaries could do nothing towards making a claim or exercising dominion over the land, as a station or otherwise, because the Hudson Bay Company would not permit its possession to be infringed. Then the land, not being occupied as a mission station, is not the land described in the act, and hence was not granted. The grantees mentioned in the act are "the several religious societies to which the stations, respectively, belong." The grantee must then have, on August 14, 1848, been in existence. The present plaintiff claims to be an incorporation created long after the grant was made. He was not, at the time of the grant, a religious society, and hence could not take as original grantee under the act. The plaintiff claims that the missionaries were sent by the bishop of Quebec. Then

was the bishop of Quebec the original grantee? It is not
so claimed. The plaintiff does not claim that he has title
himself, but says he is trustee for the Catholic church. He
does not claim that he is such trustee by virtue of any law
of the United States or of this territory, but by virtue only
of the laws of his church. Certainly he cannot claim that
he holds the legal title for the use of his church, for the
legal title can exist only by virtue of positive secular law.
A legal title cannot be created by the laws of any church.
Suppose that this court should attempt to declare the title
in the Roman Catholic Church. It would be no better than
a deed to that church. None but a legal person can take as
grantee, and a church, composed of millions of members,
is not a natural nor an artificial person. The grant cannot
go to the members, and the church is not a corporation.
What has been written refers to the words of the act only,
the text itself. The subject-matter to which congress meant
to apply it is the history of Oregon, and its occupation.
We know that the government of Great Britain and the
United States, under a treaty, were each attempting to oc-
cupy Oregon by their respective citizens; each striving to
have its citizens occupy, to exclusion of the citizens of the
other nation, so far as this could be done without breach of
the peace. As an instrumentality to effect this purpose,
the Hudson Bay Company acted for Great Britain, and
through this company British subjects were imported, who
acted under the dominion of that company. To offset
this British occupation, the United States encouraged an
American fur company to act in the same country. The
American company was ousted by the Hudson Bay Com-
pany. Incorporated American missionary societies were
then licensed by the United States to act in peopling the
country with their missionaries. The missionaries estab-
lished mission stations, formed a nucleus, and induced im-
migration. There was much excitement as to which nation
should prevail. Congress introduced bills donating to each

settler six hundred and forty acres of land.which, though they did not pass, encouraged immigration. The Americans became the most numerous. They established a provisional government, making provisions to the effect that each individual should have six hundred and forty acres of land, and missionaries, as pioneers, more than that. By this prevailing American settlement, the United States acquired the territory by treaty. This treaty stipulated that the possessory rights of the Hudson Bay Company and other British subjects should be respected. The first act to reward the pioneer was the act of 1848, and it cut down the missionaries to six hundred and forty acres, and granted that. The United States then, by purchase, extinguished the possessions of the Hudson Bay Company, and other British companies. In 1850 it passed the donation act, granting to each married American six hundred and forty acres, and to each single man three hundred and twenty acres; still recognizing the provisional government action. The possessory right to this very land was purchased by the United States from the Hudson Bay Company to extinguish British interest. The act of 1848 applies exactly to societies who sent missionaries capable, as incorporated bodies, to take a grant; capable as a society of sending missionaries, and whose missionaries had established stations among the Indian tribes, and claimed more than six hundred and forty acres of land, and dominion over it; the history of the American mission occupancy; the terms of the provisional government; and the antagonism of British subjects, which had been overcome by American pioneers. The words of the act exactly apply to the American mission societies, and to their occupation, and are not applicable to the conditions and situation and anti-American occupation of British subjects acting under the Hudson Bay Company. The word "society" applied not to a bishop or a church at large, but to those incorporated societies, who, as a person, could send missionaries, and could take

land as grantees. The whole legislation of congress shows that it intended to grant land to American subjects only, and to extinguish all claims of British subjects. The subject-matter to which the act applies, the history of the country, the statutes, and treaties all show it was the intent of congress to reward the American pioneer for opposing and overcoming British occupation. We conclude, therefore, that the act of August, 1848, did not grant, or intend to grant, land to British subjects, nor to foreigners, nor to those acting under the Hudson Bay Company, and hence in opposition to American interest. We think the so-called "missionaries" were of this latter class, and no grant was intended to be made to them.

BURKE, C. J., and NASH, J., concur in so far as to affirm the judgment of the court below.